In re **BRENTON'S COVE DEVELOPMENT COMPANY**, Debtor.

**Bankruptcy No. 8400470.**

United States Bankruptcy Court, D. Rhode Island.

Aug. 20, 1985.

Edward Bertozzi, Jr., John Deacon, Jr., Edwards & Angell, Providence, R.I., for the Bank of New York.

Jeffrey T. Teitz, Corcoran, Peckman & Hayes, P.C., Newport, R.I., for Brenton's Cove Condominium Association.

## DECISION DENYING PRIORITY STATUS TO CLAIM OF BRENTON'S COVE CONDOMINIUM ASSOCIATION

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on Brenton's Cove Condominium Association's (the Association) proof of claim, and on the objection thereto by the Bank of New York, the holder of a construction mortgage on the debtor's condominium development. At issue is whether the Association is entitled to payment of its claim, ahead of the mortgagee, from two escrow funds: (1) a $39,000 account derived from the pre-petition sale of a unit to one Roger Farrell (the Farrell fund); and (2) an account with proceeds of $890,000 from the post-petition sale of seven condominium units.

The Association asserts a statutory lien for condominium assessments, pursuant to R.I.GEN.LAWS § 34–36.1–1.01 et seq. (Rhode Island Condominium Act), and argues that its lien has priority over the Bank's mortgage. Alternatively, the Association asserts a prior right to the proceeds in the so-called Farrell fund, on the ground that that money represents "general operating revenue of the developer [the debtor]" which was escrowed for the payment of common expenses that "arose in the ordinary course of ... business." Association's "Proof of Claim and Memorandum," p. 10. The Bank concedes that its security interest does not cover the money in the Farrell fund, but argues that the $39,000 is an asset from which it is entitled to a dividend as this estate's largest unsecured creditor.

After examining R.I.GEN.LAWS § 34–36.1–1.01 et seq., and the other authorities and reasoning relied upon by the Association, we find no basis for concluding that the lien for condominium assessments takes priority over the Bank's mortgage. We also agree with the Bank's argument that payment to the Association from the Farrell fund would be a preference under § 547(c)(2).[1]

---

1. This, and all references hereafter are to the Bankruptcy Code, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353 (enacted July 10, 1984).

The facts,[2] which are not in dispute and which provide the basis for the following findings and conclusions, are as follows:

1. On September 29, 1980 the Bank of New York recorded a mortgage deed from the developer of Brenton's Cove Condominiums (the developer, later to become the debtor). The mortgage was given in exchange for financing $5.5 million for the construction of thirty-two residential units known as Brenton's Cove Condominiums, on Harrison Avenue in Newport.

2. On July 27, 1981 a Declaration of Condominium was recorded in the Land Evidence Records of the City of Newport. The Articles of the Declaration provide, *inter alia*, that unpaid common expenses for any unit in the development shall constitute a lien against that unit pursuant to § 34–36–20, of the Rhode Island Condominium Ownership Act, P.L. 1963, Ch. 181, § 1, and that the by-laws "are intended to comply with the requirements of said Title 34, Chapter 36 of the General Laws of Rhode Island...."[3]

3. The developer was able to sell only twenty-five of the thirty-two residential units, one of which was purchased in 1981 by a Roger Farrell, who gave a promissory note as part of the purchase price.

4. In October 1983, the Association adopted its 1984 budget, and assessments for pro-rata shares of common expenses were levied against each unit, payable on January 1, 1984. At that time, the developer owed $1,378 to the Association on the 1983 assessment, and $21,400 on the 1984 assessment for the seven unsold units.

5. No payments were made by the developer, and in April 1984 the Association initiated a lawsuit in Newport County Superior Court. Extensive negotiations between the parties continued over the next four months, with the developer repeatedly assuring the Association that the sale of a unit was imminent, and that the entire past due assessment would be paid from the proceeds of such sale.

6. In August 1984, Roger Farrell, the purchaser of Unit # 6, discharged his note to the developer by the payment of $39,000. An affidavit signed on October 12, 1984 by the developer's attorney, Richard Sayer, Esq., states that he received $39,000 on August 10, 1984 "for the purpose of paying the amount of the assessment claimed to be due the Brenton's Cove Condominium Association." Association's Exhibit # 7.

7. In August 1984 there were no outstanding assessments against the Farrell unit, and the sole purpose for escrowing the Farrell proceeds was to pay the assessments due on the seven unsold units.

8. On August 14, 1984, four days after the Farrell money was escrowed, the developer filed a Chapter 11 petition for reorganization. Because of the filing, the escrowed $39,000 was frozen, and no distribution has been made to the Association.

9. On December 14, 1984, with Court authorization, the debtor-in-possession sold the remaining seven condominium units for $890,000. The Bank is owed in excess of $4 million, and the Association is claiming assessment fees of $27,100. The Bank concedes that the Association has priority with respect to approximately $4,300 in post-pe-

---

**2.** This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rules 7052 and 9014.

**3.** Rhode Island has two condominium statutes, R.I.GEN.LAWS § 34–36–1, *et seq.*,—the Condominium Ownership Act, the P.L. 1963, Ch. 181, § 1, which applies to condominiums created prior to July 1, 1982, and the Rhode Island Condominium Act, R.I.GEN.LAWS § 34–36.1–1.-01 *et seq.*, which was enacted in 1982, P.L. 1982, Ch. 329, § 2, which applies to condominiums created after July 1, 1982, with certain provisions applying retroactively. One point raised

by the Bank is that the 1982 Rhode Island Condominium Act does not apply because the Declaration of Condominium incorporates by reference the 1963 statute. This issue is addressed directly by the 1982 statute, which provides that § 34–36.1–3.16 (lien for assessments) shall "apply to all condominiums created in this state before July 1, 1982; but those sections apply only with respect to events and circumstances occurring after July 1, 1982...." Since the instant dispute concerns assessments levied in 1984, it is clear that the new Act is fully applicable in the matter at hand.

tition condominium assessments, and disputes only the Association's claim for priority payment of $22,800 for pre-petition assessments.

## DISCUSSION

■ Whether the Association has a lien superior to the Bank against the $890,000 requires examination of the recently enacted Rhode Island Condominium Act, R.I. GEN.LAWS section 34–36.1–3.16, P.L. 1982, Ch. 329, § 2.

34–36.1–3.16. Lien for assessments.—
(a) The association has a lien on a unit for any assessment levied against that unit ...

. . . .

(b) A lien under this section is prior to all other liens and encumbrances on a unit *except (1) liens and encumbrances recorded before the recordation of the declaration,* (2) a first mortgage or deed of trust on the unit recorded before the date on which the assessment sought to be enforced became delinquent, and (3) liens for real estate taxes and other governmental assessments or charges against the unit. The lien is also prior to the mortgages and deeds of trust. described in subsection (2) above to the extent of the common expense assessments based on the periodic budget adopted by the association pursuant to § 34–36.1–3.15(a) which would have become due in the absence of acceleration during the six (6) months immediately preceding institution of an action to enforce the lien. This subsection does not affect the priority of mechanics' or materialmen's liens, or the priority of liens for other assessments made by the association. (emphasis added.)

. . . .

(d) Recording of the declaration constitutes record notice and perfection of the lien. No further recordation of any claim of lien for assessment under this section is required.

Since the Bank's mortgage pre-dates the Declaration of Condominium by at least ten months, it is plainly excepted from the lien priority for assessments granted by section 34–36.1–3.16(b)(3),[4] because subsections (b)(1) and (d) indicate that such assessments do not come ahead of liens and encumbrances perfected prior to the recording of the declaration. The declaration in this case was filed long after the recording of the Bank's mortgage, leaving no room for the argument that the Association's lien for assessments comes before the Bank's prior mortgage.

The Association objects to a literal reading of the Condominium Act, contending that the statute's emphasis on the act of recordation is intended to exclude only prior lienholders *without actual knowledge* of the condominium project. Since the Bank knew it was financing a condominium project, and should have known that a declaration of condominium would be filed at some time in the future, it should not be able to seek refuge in the formal notice requirements of the statute. The Association argues that § 34–36.1–3.16(b)(1)

was intended to protect those who obtained a security interest in the real estate without knowledge that a condominium development was being declared. Such lienholders should not have their security interest imperiled by the subsequent creation of a condominium of which they had no prior knowledge. Certainly the Bank of New York does not fall into this class ...

To draw a distinction between mortgages knowingly given to finance condominiums merely on the basis of whether they pre-dated or post-dated the recordation of the declaration would serve no legitimate legislative purpose. How-

<hr>

**4.** To our knowledge the recent Rhode Island condominium statute, and statutes in other states also modeled after the Uniform Condominium Act of 1980, have produced no litigation regarding compliance with due process requirements, vis-a-vis the impairment of contract rights. We do not reach the issue here, because of our finding, based on plain English grounds, that the mortgage in question, having been perfected prior to the recordation of the Declaration of Condominium, falls outside the scope of the lien provisions in question.

ever, to distinguish between those who obtain their security interest without knowledge of the planned condominium and those who acted with such knowledge would be logical and proper.

Association's Reply Memorandum pp. 1–2. There was a time when this Court was receptive to, and in fact quite susceptible to such arguments, but after a period of appeals and abrupt reversals, we have learned (hopefully) to read and apply plain English just as it is written.

In this proceeding, the short answer to the argument advanced by the Association has to be that it is not within the Court's discretion, where the language is clear, to interpret the legislative purpose to be served by distinguishing mortgages that pre-date, from those that post-date the recording of the Declaration of Condominium, particularly where there is no relevant legislative history or comment to suggest the need for a judicial interpretation of the statute in question. *See United Nuclear Corporation v. Cannon*, 553 F.Supp. 1220, 1232 (D.R.I.1982). Furthermore, this section of the Rhode Island statute is identical to that of the Uniform Condominium Act, drafted by the National Conference on Uniform State Laws in 1980 to provide model legislation for state legislatures dealing with issues of common ownership. *See* Uniform Condominium Act (1980) § 3–116, 7 U.L.A. 310 (1985 Supp.); 15A Am.Jur., *Condominiums and Co-operatives*, Cum. Supp. § 37 (July 1984). In its section on enforcement and collection of assessments, the Uniform Condominium Act states:

A lien ... is prior to all other liens ... except (i) liens and encumbrances recorded before the recordation of the declaration....

Section 3–116.

Neither the Rhode Island statute nor the Uniform Act mentions anything about actual notice or knowledge in lieu of record

notice via a declaration of condominium. That Rhode Island has adopted the identical provision of the Uniform Condominium Act strongly suggests that the exception for pre-declaration encumbrances is a purposeful (and certainly not ambiguous) provision, which should not be ignored under the Association's theory of legislative oversight. For background on the Uniform Condominium Act *see* Thomas, "The New Uniform Condominium Act," 64 A.B.A.J. 1370, 1372 (Sept.1978); Roberts, "Uniform Condominium Act—New Flexibility for Developers," 40 J.Mo.B. 177 (1984); Poliakoff, "Condominiums—The Assessment Dilemma," 54 Fla.B.J. 268 (April 1980).

Additionally, and with constitutional considerations in mind, we are most reluctant to judicially broaden the scope of a state statute so that it would substantially alter the contractual rights and obligations of these parties.[5] Although we recognize that, over time, judicial permissiveness towards local legislation has eroded the potency of the contract clause to the extent that at least one commentator has been compelled to write: "the results might be the same if the contract clause were dropped out of the Constitution, and the challenged statutes all judged as reasonable or unreasonable deprivations of property,"[6] we view the contract clause as imposing some restraint on the state's power to abridge existing contracts, even in the otherwise legitimate exercise of police powers aimed at correcting social or economic evils. *Allied Structrual Steel Co. v. Spannaus*, 438 U.S. 234, 242, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978); *see also Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231 (1934). We would, therefore, be hard pressed, even if we were to find the Association's argument persuasive, to overlook a protection so clearly granted under § 34–36.1–3.16, and to subordinate the Bank's pre-declaration mortgage to the Condominium Association's lien

---

**5.** The contract clause states: "no state shall ... pass any ... law impairing the obligation of Contracts." U.S. Constitution, Art. I. § 10.

**6.** *See* Hale, "The Supreme Court and the Contract Clause: III," 57 Harv.L.Rev. 852, 890–891 (1944), *quoted in Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241, n. 12, 98 S.Ct. 2716, 2720, n. 12, 57 L.Ed.2d 727 (1978).

for assessments, as against the $890,000 fund.

■ With respect to the $39,000 escrowed by Sayer, the Association stands on no better footing. In the first place, the lien created by § 34–36.1–3.16 may not attach to the Farrell unit proceeds because all assessments on the Farrell unit had been paid in full by the time the money in question was put in escrow. The statutory lien under consideration here applies only against the particular unit (or to the proceeds from the sale thereof) for which assessments are unpaid. For that reason the Association's priority claim to the Farrell proceeds for unpaid assessments on seven other units is rejected.

■ The Association's alternative argument, vis-a-vis the Farrell fund, is that payment for past due assessments would not constitute a preference because such a payment would be for expenses arising in the ordinary course of business. This argument is also rejected, notwithstanding the liberalization of the amended § 547(c)(2),[7] which excepts from the definition of preference, a transfer:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

On the facts before us, it is clear that payment from the Farrell fund could in no way qualify as a payment in the ordinary course of business. *See Barash v. Public*

*Finance Corp.*, 658 F.2d 504, 510 (7th Cir. 1981) (irregular or unusual payments are not protected against the trustee's avoidance power). The assessments in question became due and payable on January 1, 1984. When payment was not made by April, the Association initiated a lawsuit, and only after extensive negotiation and collection efforts were funds finally escrowed by attorney Sayer, purportedly on behalf of the Association. This occurred on August 10, 1984, more than six months after the debt was incurred, after intensive collection efforts by the Association, and only four days prior to the filing of the bankruptcy petition. These facts fit the classic preference situation of a long overdue obligation, pressure exerted by the creditor, and a lump sum payment made shortly before the filing of the bankruptcy petition. The only difference is that here the objector enjoys the luxury of being able to examine the allegedly preferential payment before it is made. *See Carmack v. Zell (In re Mindy's, Inc.)*, 17 B.R. 177, 5 C.B.C.2d 1451 (Bankr.S.D.Ohio 1982). Of no application in the instant proceeding, is the § 547(c)(2) exception whose purpose

> is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 373–74 (1977), *reprinted in* 5 U.S.Code Cong. & Admin.News 5787, 6329, 6328 (1978); S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), *quoted in Barash v. Public Finance Corp.*, *supra* at 510.

---

7. This proceeding is governed by section 547(c)(2), as amended by the Bankruptcy Amendments & Federal Judgeship Act of 1984 (enacted July 10, 1984). Unlike the amended statute, former § 547(c)(2) included a 45 day rule which was virtually always dispositive, because unless the transfer occurred within 45 days after the debt was incurred, there was no need to consider whether payment was in the ordinary course of business:

(c) The trustee may not avoid under this section a transfer—

. . . .

(2) to the extent that such transfer was—
(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
*(B) made not later than 45 days after such debt was incurred;*
(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(D) made according to ordinary business terms; (emphasis added).

The actions of the parties in setting up the Farrell escrow account do not reflect "normal financial relations," and we find as a fact and conclude as a matter of law that payment of the pre-petition assessments would fall plainly within the § 547 prohibition.

For all of the foregoing reasons, the Association's claim for pre-petition assessments is denied as a priority claim against both escrow accounts, but is allowed in the amount of $22,800, as an unsecured claim.

Enter Judgment accordingly.