In re ENERGY COOPERATIVE,
INC., Debtor.

ENERGY COOPERATIVE, INC., and
Jay A. Steinberg, Trustee, Plaintiffs,

v.

FINA OIL AND CHEMICAL
COMPANY, Defendant.

Nos. 81 B 5811, 85 C 4259 and
82 A 3718.

United States District Court,
N.D. Illinois, E.D.

Dec. 12, 1986.

Larry L. Thompson, Joan S. Kato, Bell, Boyd & Lloyd, Chicago, Ill., for defendant.

Ronald Barliant, Judith S. Wolicki, Miller, Shakman, Nathan & Hamilton, Chicago, Ill., for plaintiff.

## MEMORANDUM OPINION

KOCORAS, District Judge:

This matter comes before the Court on defendant's motion for summary judgment. For the following reasons, this motion is granted.

### FACTS

This is an action by the Trustee pursuant to 11 U.S.C. § 547 to set aside an allegedly preferential transfer made by Energy Cooperative, Inc. ("ECI") to Fina Oil and Chemical Company ("Fina"). On March 24, 1976, Fina and ECI entered into an agreement (the "Exchange Agreement"), whereby Fina would make available or would "deliver" to ECI and ECI's customers certain petroleum products (the "product"), and ECI would deliver to Fina, generally in advance, approximate monthly quantities of these products "to balance." During the course of the agreement, ECI customers drew, by truckload, the Fina product from Fina terminals, and ECI delivered sufficient quantities of the product by pipeline to Fina to balance the withdrawals by the ECI customers.

During the first 10 to 15 days of each month, Fina and ECI would each prepare and send the other party a monthly "Exchange Statement," which would reflect the balance of product between the parties for the previous month. On February 14, 1981, ninety days prior to ECI's bankruptcy filing, the balance of exchanged product was in ECI's favor by 75,407 gallons (i.e., Fina "owed" ECI 75,407 gallons), and remained so until February 17 when the balance swung in Fina's favor. During the period from February 17 to March 27, 1981, ECI customers obtained more product from Fina than ECI had delivered to Fina. As a result, the exchange balance favored Fina

throughout this period. On March 19, 1981, ECI delivered to Fina, in two separate pipeline transfers, 842,856 gallons of product. On March 27, 1981, ECI made a "book transfer" [1] to Fina of 1,050,000 gallons.

These last three transfers by ECI are the subject of the present proceeding. Jay Steinberg, trustee in bankruptcy for the estate of ECI, exercising the avoiding power granted to him under 11 U.S.C. § 547, brought an action to recover as preferential, the transfers to Fina made on March 19 and March 27. On November 18, 1985, Fina motioned the Court for summary judgment. In support of this motion, Fina contends that the disputed transfers were in payment of a debt incurred in the ordinary course of business, and thus, are excepted from avoidability pursuant to 11 U.S.C. § 547(c)(2).[2]

## DISCUSSION

 Summary judgment is appropriate only if it appears that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). For the purpose of determining whether any material fact remains disputed, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Rodeo v. Gillman*, 787 F.2d 1175, 1177 (7th Cir.1986) (citations omitted). If the evidence is subject to conflicting interpretations, or if reasonable people might differ as to its significance, summary judgment is not appropriate. *Id.*

With these principles in mind, the Court turns to the substantive allegations of defendant's motion for summary judgment. Under section 547(c)(2), the trustee is prevented from avoiding an otherwise "preferential transfer" to the extent that such transfer was:

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). Here, Fina contends that all of the § 547(c)(2) requirements have been satisfied with respect to the three allegedly preferential transfers of product. The Court agrees.

### I. *The Transfer Was Made Within 45 Days of the Date the Debt Was Incurred*

Fina contends that both the March 19th and March 27th transfers were made within 45 days of February 17, the earliest date during the relevant 90–day period [3] that ECI could arguably have "incurred a debt" to Fina. In evaluating the merit of this contention, it is necessary for the Court to determine when the transfers were made and when the debt was incurred. It is undisputed that the transfers in question occurred on March 19th and March 27th. Thus, the pivotal question before the Court is when the debt was incurred.

 The term "incurred" is not defined in the Bankruptcy Act of 1978. Most courts, however, including the United States Court of Appeals for the Seventh

---

**1.** In a "book transfer," no physical delivery of product is made. Rather, the assigned ownership of a specific quantity of the product is changed from one party to the other. Book transfers between ECI and Fina were generally documented by a telex and were recorded in the usual manner.

**2.** The changes made to Title 11 of the United States Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984, including the deletion of the 45–day time limit from § 547(c)(2), are only applicable to cases filed on

or after October 9, 1984. *See* Pub.L. No. 98–353, Sec. 553(a) (July 10, 1984). Thus, as this case was filed in 1981, the Court gives no weight to the 1984 Amendments in deciding this matter.

**3.** Under § 547(b), a pre-petition transfer by the debtor is avoidable only if, *inter alia*, it was made within 90 days of the filing of the petition. ECI filed for its Chapter 11 petition on May 15, 1981. Thus, the relevant 90–day period commenced on February 14, 1981.

Circuit, have held that a debt is incurred for purposes of section 547(c)(2) when the debtor becomes legally obligated to pay. *See Barash v. Public Finance Corp.,* 658 F.2d 504, 510 (7th Cir.1981); *Matter of Almarc Mfg., Inc.,* 52 B.R. 582, 585 (Bankr. N.D.Ill.1985) (other citations omitted). In a contract for the sale of goods which conditions payment on future performance, a legal obligation to pay arises, and thus, a debt is incurred, when performance takes place, i.e., either on shipment or delivery, and *not* when the contract is entered into. *See Matter of H & A Construction Co., Inc.,* 65 B.R. 213 (Bankr.D.Mass.1986); *In re Blanton Smith Corp.,* 37 B.R. 303 (Bankr.M.D.Tn.1984); *In re Gold Coast Seed Co.,* 35 B.R. 12, 13 (Bankr.N.D.Ca. 1983). *See also* Levin, *An Introduction to the Trustee's Avoiding Powers,* 53 Am. Bankr.L.J. 173, 187 (1979).

■ The Trustee contends that the debt here was incurred five years ago, when the Exchange Agreement was originally entered into. In every case upon which the Trustee relies for his assertion that a debt is incurred for purposes of § 547(c)(2) when the original contract is signed, however, the debtor had received all or part of the consideration which was the subject matter of the contract, immediately upon the signing of such contract. In no instance was the "incurring of a debt" found on the basis of a naked promise before performance had commenced.[4]

Moreover, the Trustee's argument is defeated by the clear and unambiguous terms of the Exchange Agreement itself. The Agreement provides, in pertinent part, that Fina shall "deliver" an "approximate monthly quantity" of product to ECI and ECI's customers, and that in exchange Fina

---

4. ECI's reliance on *Kallen v. Litas,* 47 B.R. 977 (N.D.Ill.1985), for its assertion that the debt was incurred in the present case when the original contract was signed, is misplaced. In *Kallen,* the debtor retained the defendant law firm on October 11, 1985, and the firm started to render services on the debtor's behalf on that day. The relevant transfer was made subsequently, on November 17, 1981. Judge William T. Hart affirmed the bankruptcy court's finding that although the retainer agreement appeared to be a contingent fee arrangement, in reality the firm was compensated on an hourly basis and thus the transfer was on account of the antecedent debt incurred when the services had been rendered.

In *dicta,* Judge Hart went on to say, alternatively, that even if the court "were to hold that a true contingent fee arrangement existed..., it would still find that the debt was incurred on October 11, 1981...." *Id.* at 982. He argued that since under § 101(11), a "debt" is defined as a "liability on a claim;" and under § 101(4), a "claim" includes a contingent right to payment; that a debt must also include liability on a contingent right to payment. *Id.*

This court does not disagree with Judge Hart's conclusion that a "debt" may be defined under the Bankruptcy Act, in part, as a liability on a contingent claim. This analysis, however, merely begs the question as to whether or not a debt is "incurred" for the purposes of § 547(c)(2) at the time one becomes potentially liable for a contingent debt.

The Eighth Circuit observed in *In re Iowa Premium Service Co.,* 695 F.2d 1109, 1111 (8th Cir.1982) (cited with approval in *Kallen*), that these definitional provisions of the Bankruptcy

Act "leave unanswered the question of *when* a debt is 'incurred.'" *Id.* (Emphasis added). In the context of the course of business exception, § 547(c)(2), the *Iowa Premium* court held that "a debt is incurred when the debtor obtains a property interest in the consideration exchanged giving rise to the debt." *Id.* at 1112. Thus, the debtor was not legally bound to pay interest when a note was executed because the debt was not incurred until the interest actively accrued. *See also Matter of Emerald Oil Co.,* 695 F.2d 833, 837 (5th Cir.1983) (while acknowledging that a "debt" can be defined as a liability on a contingent claim, the Fifth Circuit held that a debt is not "incurred" under § 547(c)(2) until a resource is consumed or a service performed).

Moreover, Judge Hart's reliance on *In re Hudson Valley Quality Meats, Inc.,* 29 B.R. 67 (Bankr.N.D.N.Y.1982), in support of his assertion that a debt would be incurred upon the signing of a contingent fee contract, is inappropriate. *Hudson* merely examines the definition of the term "debt" under Section 63 of the Bankruptcy Act of 1898. Section 63 defines the types of debts which are provable by the *creditor* against the *debtor.* The language in *Hudson* upon which Judge Hart relies—"A debt may depend, as to existence or amount, on either the occurrence or the timing of some future event" —merely stands for the proposition that a creditor may have a claim against the debtor "founded upon a contingent contractual liability." Id. at 72.

In sum, Judge Hart's *dicta* in *Kallen* is not essential to his holding in that case, and is contrary to the rule set forth in *Iowa Premium* and to the other cases cited above in this opinion.

shall "receive" an "approximate monthly quantity" of product from ECI *"To Balance."* (Emphasis added). In short, it is the transfer of products by one exchange partner to the other which triggers the obligation, i.e., creates the "debt," to return an equal amount of product to the other partner. Thus, no antecedent debt existed here until one partner owed product to the other on account of a prior delivery by the other.[5]

February 17, 1981, marked the first date during the relevant 90–day period that the exchange balance was in Fina's favor, i.e., ECI "owed" Fina product, as a result of Fina's deliveries of product to ECI and ECI's customers. Thus, the debt in the instant case was "incurred," at the earliest, on February 17th. The March 19th and March 27th transfers made by ECI to Fina were in payment of that debt.[6] Clearly, if the debt was incurred on February 17th, both transfers were made within the applicable 45–day period.

II. *The Transfer Was in Payment of a Debt Incurred in the Ordinary Course of Business, Was Made in the Ordinary Course of Business, and Was Made According to Ordinary Business Terms.*

■ First, the Trustee contends that the debt was not incurred in the "ordinary course of business," as generally ECI delivered product to Fina in advance, and thus, it was *unusual* for ECI to owe product to Fina. This assertion, however, is wholly unsupported by the facts of the case, and is refuted by the relevant case law. Contrary to the Trustee's contention, it is an undisputed fact that there were several times during the course of the operation of the exchange agreement when ECI owed product to Fina. Even if this had been the one and only time that ECI owed product to Fina, however, the Trustee cites no case law and the Court can find no authority for the proposition that the frequency with which debts are incurred between the debtor and creditor should be a factor in determining whether the debt was incurred in the ordinary course of business. Rather, the cases in which debts were found to have been incurred *outside* the "ordinary course of business," either involved debts which were incurred in transactions that had no relationship to the debtor's usual commercial affairs; involved debts which resulted from a transaction of a type in which the debtor had never engaged; or involved evidence of inside knowledge or pressure by the creditor to pay an overdue debt raising a clear inference of an intent to prefer a creditor.[7] None of these situations applies to the present case. Here, ECI and Fina engaged only in their usual and customary business, namely, the exchange of petroleum products. Further, there is no evidence offered by the Trustee of any inside knowledge or pressure by Fina upon ECI.

■ Second, the Trustee argues that the March 27 book transfer[8] was not made "in

5. The deposition testimonies of James A. Nelson, former Manager of Oil Movements for ECI and "consultant" to the Trustee, Donald A. Sabey, former ECI Director of Product Supply and Distribution, and Robert B. Bossung, the ECI executive primarily responsible for negotiating and signing the Exchange Agreement, confirm the fact that the specific amounts of product noted in the Exchange Agreement were only estimates, and that it was the actual *delivery* of product, or its equivalent, which created the *obligation* to return product to balance. *See* Nelson Dep. 50–53, 74, 152, 156–157; Sabey Dep. 28–29, 52, 54–55, 87; Bossung Dep. 54–56.

6. Donald Sabey testified that ECI *"owed* Fina some product and this [the relevant transfers] *paid off* that *debt."* Sabey Dep. 87 (Emphasis added).

7. *Kallen v. Litas,* 47 B.R. 977 (Bankr.N.D.Ill. 1985) (lawsuits not part of the debtor's ordinary course of business); *In re Brenton's Cove Development Co.,* 52 B.R. 287, 292 (Bankr.D.R.I.1985) (long overdue obligation, pressure exerted by the creditor, and a lump sum payment made 4 days before filing the bankruptcy petition); *In re Western World Funding, Inc.,* 52 B.R. 743 (Bankr.Nev.1985) (debtor repaid short-term loans made by an insider, not in the lending business, who knew of the debtors' precarious financial condition).

8. The Trustee does not refute that the March 19 transfers were made in the ordinary course of business and according to ordinary business terms.

the ordinary course of business", as this was the only time in five years that ECI had used a book transfer in lieu of a physical transfer of product to Fina. Again, this conclusion is contrary to the applicable case law. While § 547(c)(2)(C) requires the transfer to be made in the "ordinary course of business," it does *not* require the payment to be "common." As the court stated in *In re Economy Milling Co.*, 37 B.R. 914 (D.S.C.1983), "an extensive showing that such transactions occurred often, or even regularly, is not necessary.... [A] transaction can be ordinary and still occur only occasionally." *Id.* at 922. Similarly, the transaction does not have to be of the type in which the parties were most often involved. *See e.g., In re Garland*, 39 B.R. 412 (Bankr. E.D.Mo.1984) (payment by debtor pursuant to a tax levy on all property of debtor's lessee excepted under section 547(c)(2), although debtor was not in the business of paying tax liabilities on behalf of lessees).

■ The term "ordinary" contemplates, at least in part, "that which is ordinary between the respective parties." *In re Ewald Bros., Inc.*, 45 B.R. 52, 57 (Bankr.D. Minn.1984). The Court need not, however, rely solely upon the previous transactions between the parties, but also may look to similar transactions between either of the parties and third persons in determining whether the transfer was "ordinary." *See In re Craig Oil Co.*, 785 F.2d 1563, 1566–67 (11th Cir.1986) (in determining whether payment by cashier's check was within "ordinary course of business", court looked to payments by debtor to others and others' payments to creditor); *In re Economy Milling*, 37 B.R. at 922 (the creditor "need only to have shown that he *or other* farmers had entered into like options contracts with the debtor in the past") (Emphasis added).

■ Here, it is undisputed that book transfers are common in the industry to which ECI and Fina belong; that ECI and Fina regularly engaged in book transfers in connection with the operation of other exchange agreements; and that in the operation of the ECI/Fina Exchange Agreement, the March 27 book transfer was treated by both parties as if it were any other physical transfer of product.[9] In short, in claiming that the March 27 book transfer was not made within the "ordinary course of business," the Trustee mistakenly confuses "ordinary" with "common."

■ Lastly, the Court finds that the March 27 book transfer was made according to ordinary business terms. Although the Exchange Agreement did not contain an explicit provision for book transfers, similarly, it did not expressly prohibit them. Moreover, as previously discussed, book transfers are quite common in the industry and were often used by both ECI and Fina.

The facts of the instant case, read in light of the foregoing authority, compel the finding that as a matter of law all of the § 547(c)(2) requirements have been satisfied with respect to the March 19 and March 27 transfers, and thus, said transfers are excepted from avoidability.[10] Accordingly, defendant's motion for summary judgment is granted.

---

9. The book transfer was reflected on the monthly exchange statement. Fina credited ECI's exchange balance just as though Fina had received actual physical delivery of product. The amount of the book transfer was also included in the exchange statement's monthly totals, together with all the product received by ECI and Fina by physical transfer.

10. The Court's finding today comports with the primary purpose underlying § 547(c)(2), namely, to "leave undisturbed normal financial relations between parties." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 6329, S.R. Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5874.